MS. 2011r25

## AFFIDAVIT

**I, Josue Menendez, being duly sworn, do hereby depose and state as follows:**

1. I am a Special Agent of the U.S. Immigration and Customs Enforcement (ICE) assigned to the office of the Special Agent in Charge (SAC) San Juan, Puerto Rico. As such, I am a law enforcement officer of the United States within the meaning of Title 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 U.S.C. § 2516(1). I was employed by the U.S. Department of the Treasury, U.S. Customs Service, from March 2001 until May 2004. I have been consecutively employed as a Special Agent with ICE since May 2004 and currently assigned to the Financial Crimes Investigations Group (FCIG).

2. As a Special Agent, I have participated in several money laundering and drug related investigations, some of which were related to large-scale money laundering and drug trafficking organizations. During the course of these investigations, I have become familiar with the trafficking of illegal drugs and its proceeds on an international scale with an emphasis on money laundering and drug trafficking organizations based in Puerto Rico. As part of my official duties, I have conducted arrests of persons engaged in illegal drug activities and its proceeds; have assisted in the execution of search warrants of homes and property of persons engaged in money laundering activities and have participated in seizures of property amounting to hundreds of thousands of dollars, which constituted proceeds of illegal drug trafficking activity. During the course of these investigations, I interviewed persons involved in the drug trafficking and money laundering business regarding the habits and practices of people engaged in the illegal trafficking of drugs and the methods utilized to launder its

1

proceeds. I have also participated in numerous investigations involving wiretaps, and I have reviewed records relating to narcotics trafficking and money laundering.

3. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs and the manner in which proceeds of drug trafficking are laundered. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am aware that drug traffickers often place telephones they own and use in the names of third parties or under fictitious names in order to avoid detection by law enforcement authorities and change telephone numbers for this same purpose. I am also aware that drug traffickers often speak in guarded or coded language when discussing their illegal business in an effort to further prevent detection.

4. This affidavit is based upon my experience, training and personal knowledge derived from my participation in this investigation, and based upon credible information from:

    a. Oral and written reports and documents received from federal, foreign, state and local law enforcement agents and the Puerto Rico Police Department (PRPD);

    b. Physical surveillance conducted by the aforementioned law enforcement agencies;

    c. Review of telephone subscriber information, toll records and pen register trap and trace information;

    d. Debriefings of confidential source and witnesses;

    e. Public information and records.

5. Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by federal, foreign, state and local law enforcement agencies and the PRPD. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are among several statements made by others and are stated in substance, unless otherwise indicated. Moreover, information resulting from surveillance, except where otherwise noted, does not set forth my personal observations but rather has been provided directly or indirectly through other law enforcement officers who conducted such surveillance.

6. Based upon my personal knowledge and information furnished to me by other Federal and State Law Enforcement Officers, I am fully aware of and allege the following facts to be true and correct:

7. On April 2, 2010, Roberto MENDEZ-Hurtado coordinated via telephone, with ICE undercover (U/C) agent located in Puerto Rico, a drug smuggling venture of approximately 130 kilograms of cocaine to be collected in St. Thomas, USVI, for subsequent distribution in Puerto Rico and the State of New York. During their telephonic conversation, MENDEZ-Hurtado provided ICE U/C agent with telephone number 340-642-4398 belonging to an unknown individual (later identified as Roberto DE LOS SANTOS) based in St. Thomas, USVI and member of MENDEZ-Hurtado's drug trafficking/money laundering organization (DT/MLO). MENDEZ-Hurtado instructed U/C agent that when contacting his man in St. Thomas to identify himself using the code phrase "Vale de parte de Vladi". On this same day, at approximately 2300 hours, ICE U/C agent contacted DE LOS SANTOS at the telephone number provided by MENDEZ-Hurtado to receive

further instructions as to the smuggling venture. Upon contacting DE LOS SANTOS and stating the code phrase provided by MENDEZ-Hurtado, an agreement was reached in which U/C agents would travel to St. Thomas, USVI on April 4, 2010 and receive from DE LOS SANTOS approximately 130 kilograms of cocaine.

8. On April 3, 2010, at approximately 1740 hours, ICE U/C agent contacted DE LOS SANTOS via telephone and confirmed their smuggling venture plan for the following day. During their telephonic conversation, DE LOS SANTOS advised the U/C agent that he would need to provide a rental vehicle upon his arrival into St. Thomas and that once he reached the area to contact him again for further instructions.

9. On April 4, 2010, at approximately 1300 hours, ICE SAC San Juan U/C agents, along with Customs and Border Protection (CBP) officers, departed Ceiba, Puerto Rico in a U/C vessel to the ST. Thomas, USVI shoreline and at approximately 1500 hours, the UC vessel arrived at the ST. Thomas French Town marina where it docked.

10. At approximately 1615 hours, the U/C agents arrived at Betsy's Restaurant and contacted DE LOS SANTOS to advise him of their location. DE LOS SANTOS did not accept the proposed meeting place (French Town) and requested the U/C agents to meet him at The Shipwreck Landing (a bar/restaurant business in St. Thomas). At approximately 1720 hours, the U/C agents arrived at The Shipwreck Landing where they met with DE LOS SANTOS at approximately 1830 hours. Upon DE LOS SANTO'S arrival, he requested the U/C agents to follow him to which, after a brief discussion that included MENDEZ-Hurtado via phone, was agreed to do.

11. The U/C agents followed DE LOS SANTOS who was driving a red pick-up truck bearing license plate number TCO-968. While the U/C agents were following DE LOS SANTOS, he parked

4

at the side of Crown Mountain Road and opened the hood of the pick-up truck. DE LOS SANTOS instructed the U/C agents to stay with the pick-up truck and requested to take the U/C's rental vehicle in order to get the contraband. DE LOS SANTOS told the U/C agents that if the local police showed up to tell them that they had a vehicle break down but that they had already called a tow truck.

12. At approximately 1900 hours, DE LOS SANTOS arrived to the area where he left the U/C agents and returned the U/C agent's vehicle with four black luggage pieces containing approximately 130 kilograms of cocaine. DE LOS SANTOS escorted the U/C agents near the French Town marina and before departing, requested the U/C agents to call him once they made it to Puerto Rico to let him know that everything was okay.

13. At approximately 2000 hours, the U/C vessel left the ST. Thomas shoreline and subsequently conducted a sea transfer of the evidence to a CBP vessel while another CBP midnight vessel provided escort in transporting the evidence to the San Juan seized property custodian (SPC) for processing. The total amount seized weighted 142.4 kilograms of cocaine.

14. I hereby declare that the foregoing is true and correct to the best of my knowledge pursuant to the investigation conducted in this case.

_____
Special Agent, ICE

Sworn to, on the 3th day of February 2011, before,

_____
U.S. MAGISTRATE JUDGE